# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARY J. BUB,**

                    **Plaintiff,**

-vs-                                                    **Case No.  6:05-cv-227-Orl-JGG**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

                    **Defendants.**

_____

## MEMORANDUM OF DECISION

Plaintiff Mary J. Bub ["Bub"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On October 5, 2001, Bub filed a claim for disability insurance benefits, claiming disability as of August 19, 1999 due to problems with her right ankle stemming from a fracture of her ankle in 1998 and subsequent surgeries. R. 47-49, 78-79. Her claim was denied initially (R. 45), and on reconsideration (R. 41). On April 14, 2004, the Honorable Henry U. Snavely, Administrative Law Judge ["ALJ"], held a thirty-five-minute hearing on Bub's claim in Orlando, Florida. R. 320-55. Attorney Richard McCullough represented Bub at the hearing. R. 320. The ALJ heard testimony from Bub.

On May 24, 2004, the ALJ issued a decision that Bub was not disabled and not entitled to benefits.  R. 23.  Following a review of the medical and other record evidence, the ALJ found that Bub retained the residual functional capacity ["RFC"] to perform some of physical exertional requirements of light work, including the ability to lift and carry twenty pounds occasionally and ten pounds frequently.  R. 21, 22, Finding 7.  The ALJ found that Bub could perform her past relevant work as a medical receptionist as the job did not require the performance of work-related activities precluded by her residual functional capacity.  R. 23, Finding 8.  As Bub could perform her past relevant work, she was not disabled.[1]  *Id.*, Findings 9, 10.

On October 16, 2004, the Appeals Council denied review.  R. 7.  On February 14, 2005, Bub timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1, ¶ 3.  On September 28, 2005, Bub filed in this Court a memorandum of law in support of her appeal.  Docket No. 17.  On November 28, 2005, the Commissioner filed a memorandum in support of her decision that Bub was not disabled.  Docket No. 18.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Bub assigns two specific error to the Commissioner.  First, Bub claims that the Commissioner erred by failing to fully develop the record on both the physical and mental demands of Bub's past relevant work, and therefore erred in finding that Bub could perform her

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court.  According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

past relevant work as a medical receptionist.  Docket No. 17 at 12.  Second, Bub claims that the Commissioner erred by failing to properly discount Bub's testimony about her pain.  *Id.* at 14.

The Commissioner argues that substantial evidence supports her decision to deny disability.  First, the Commissioner argues that, while the ALJ did not specifically discuss all demands of Bub's past relevant work, substantial evidence nevertheless supports the finding that Bub could perform her job as a medical receptionist.  Docket No. 18-1 at 6.  Second, the Commissioner argues that the ALJ properly considered and rejected Bub's subjective complaints of pain.  *Id.* at 7-10.

## III.   THE STANDARD OF REVIEW

### A.     AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th

Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

-4-

## C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the

need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and

appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new
> evidence which is material and that there is good cause for the failure to incorporate
> such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is

new, non-cumulative evidence; 2.) that the evidence is material —  relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and 3.) there is good

cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 -

92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547,

1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v.

Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at

1095.  With a sentence-six remand, the parties must return to the district court after remand to file

modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending

remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

IV.     **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

A.      **DEVELOPING THE RECORD**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v.*

*Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).

-9-

If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.   OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th

Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  *Foote*, 67 F.3d at 1559.

### D.      TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

-11-

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to

-12-

the status of a physician as treating or non-treating in weighing an opinion on whether the claimant

meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545

and 404.1546), or the application of vocational factors because those ultimate determinations are

for the Commissioner.  20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical

opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*,

825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is

impossible for a reviewing court to determine whether the ultimate decision is supported by

substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress

has determined that a claimant will not be considered disabled unless he furnishes medical and

other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms,

including pain, and determine the extent to which the symptoms can reasonably be accepted as

consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether

the medical signs and laboratory findings show medical impairments which reasonably could be

expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain

standard":

> The pain standard requires (1) evidence of an underlying medical condition and
> either (2) objective medical evidence that confirms the severity of the alleged pain

arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*

*v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.   MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### V.   <u>APPLICATION AND ANALYSIS</u>

### A.   THE FACTS

Bub was born on October 6, 1950, and was fifty two years-old on the date of the expiration of her insured status on September 30, 2003.  R. 47, 50.  Bub completed high school, and worked as a medical receptionist, an amusement park hostess and sales clerk, a supermarket cashier, a supermarket bakery associate, and an airport shipping office clerk.  R. 67-71, 80, 85, 327-32.

Bub reports being injured on July 11, 1998, while working at a retail hostess at Disney Market Place Village. R. 103. She was walking in the rain and slipped, twisting her right ankle. *Id.*   On July 30, 1998, Bub went to the Orlando Orthopaedic Center with complaints of pain in her right ankle. *Id.* Bub reported to the Orlando Orthopaedic Center that she had gone to the Emergency Room at Sand Lake Hospital on the day of the fall, and that her x-rays were negative.[3] *Id.* At the Orlando Orthopaedic Center, Dr. Robert Palumbo assessed right ankle sprain, traumatic Achilles tendinitis, and traumatic tarsal tunnel syndrome secondary to swelling. R. 101.

Dr. Palumbo's examination of the Bub's lower extremities  revealed a genu valgum alignment, and decreased medial longitudinal arch. R. 100-01. Bub was unable to toe raise because of her pain. R. 101. Bub's right ankle demonstrated restricted range of motion from zero degrees of dosiflexion to forty degrees of plantar flexion. *Id.* Other than pain and tenderness in various parts of her right ankle, the rest of the neurological examination was normal. *Id.* Dr. Palumbo reviewed X-rays taken at Sand Lake hospital the day of Bub's fall. *Id.* The x-rays showed an osteochondral lesion of the talar dome on the lateral aspect, but Dr. Palumbo noted that the chronicity of the injury was difficult to assess, stating that he could not see any obvious fractures. *Id.* Dr. Palumbo recommended use of a fracture walker and a cane, and stated "[h]er work status is sedentary desk work only." R. 100 (emphasis in original).

Bub returned on August 13, 1998 and reported some improvement in her pain but still having problems. R. 100. Dr. Palumbo stated that Bub's symptoms were beginning to "resolve," and referred Bub to physical therapy to improve her symptoms, range of motion, and start

_____

[3]Bub did not submit any medical records prior to July 30, 1998.

-16-

strengthening exercises. *Id.* He advised Bub to remain in her fracture walker for the next three

weeks, and again noted that her work status was only sedentary. *Id.*

On September 8, 1998, Bub returned to Dr. Palumbo for another follow-up visit. She again

reported improvement, but still some pain. *Id.* The doctor's physical examination showed that

Bub's ankle was improving. R. 99. Her range of motion was seven degrees of dorsiflexion and

forty degrees of plantar flexion. Her subtalar motion was "improving." *Id.* Dr. Palumbo stated

that Bub still had pain over her Achilles tendon but less than previously noted. *Id.* Bub also had

less swelling. *Id.* Dr. Palumbo diagnosed status post ankle sprain with traumatic Achilles

tendinitis. *Id.* He recommended that she wean herself off using the fracture walker, and use a

stirrup brace with heel lifts in both shoes. *Id.* He also recommended that she continue her exercise

program, and continued restricting her work to "sedentary" work. *Id.*

Dr. Sam Murrell from the Orlando Orthopaedic Center saw Bub on March 4, 1999. *Id.*

Bub complained of significant neck and back pain since January 1999, and reported that her back

pain was the result of using her cane. *Id.* Bub told Dr. Murrell that her symptoms increased while

sitting, standing, walking, and bending forward. R. 98. Bub's pain lessened when she lay down,

took medication, or used Ben Gay. *Id.* Bub also noted that she took Motrin and Roxicet, and that

Motrin "control[s]" her symptoms. *Id.* Bub denied that her neck and back pain radiated to her

arms and legs. *Id.* Dr. Murrell's impression was underlying degenerative disc disease of the

cervical and lumbar spine, cervical strain, and lumbar strain. R. 95. X-rays showed no evidence

of acute fracture or acute bony abnormality, but x-rays of the cervical spine revealed early

degenerative changes involving multiple levels, in particular, at C4-C5 and C5-C6. R. 96.

-17-

Bub's lumbar x-rays showed degenerative changes at L2-L3, and "to a lesser degree[,]" degenerative changes with osteophyte formation at L3-L4 and L4-L5. *Id.* Strength in her upper and lower extremities were normal. R. 96-97. Straight leg raising was negative, and Bub could walk heel to toe. *Id.* Dr. Murrell told Bub that her cervical and lumbar strain were not related to her ankle injury, and that her back and neck pain may have increased as a result of an upper respiratory infection. R. 95. He recommended lumbar stretching, strengthening exercises, and that she continue taking anti-inflammatory medications. *Id.* Dr. Murrell also added "I think she may return to work in a light duty status on [March 8, 1999]. I would not anticipate these to be permanent restrictions and would expect within one month she could return to work without limitations concerning her lower back." *Id.*

On March 22, 1999, Bub went to Carolyn Peckham, a registered nurse for Bub's employer, with complaints of pain in her right hand. R. 158. Bub told Peckham that, on February 15, 1999, Bub was using the cash register at work and began to have pain in her right hand. *Id.* Bub felt no numbness or tingling, but pain that radiated into the little and ring fingers and up her forearm. *Id.* The registered nurse assessed repetitive trauma disorder of the right hand. *Id.* In a note dated March 29, 1999, a licensed practical nurse affiliated with Bub's employer stated that Bub was restricted to light duty, and could not lift over five pounds (due her problems with her right hand) for approximately one week (from March 29, 1999 until April 7, 1999). R. 162. The same day, the nurse also gave Bub restrictions due to her right ankle injury. *Id.* Bub could not stand or walk for more than forty minutes each hour until April 12, 1999, after which Bub could stand or walk for up to fifty minutes each hour. *Id.*

-18-

On April 7, 1999, Bub saw Dr. Jerry A. Rubin, who diagnosed Thoracic Outlet Syndrome, Ulnar Neuritis, and Tendinitis in her hands.  R. 164.  Dr. Rubin noted that Bub could return to work for "light duty," and was restricted to lifting not more than two pounds, no lifting over her shoulder, and no repetitive lifting, pushing or pulling, and grasping or pinching.  *Id.*

On April 8, 1999, Bub went back to her employer's health clinic.  She first saw Kathleen Quarti, a registered nurse for Bub's employer, with complaints of pain in the right shoulder and upper back.  R. 163, 167.  Bub stated that reaching and stretching at work caused her pain, stating that collating books and constantly reaching for papers hurt her shoulder.  R. 163.  Bub reported having some numbness and tingling when she extended her right arm to grasp an object.  R. 167.  The nurse assessed repetitive trauma disorder right shoulder, noting that Bub was alert and in no acute distress with some tenderness over the right medial periscapular region.  *Id.*  Bub had no swelling, and normal range of motion of the right shoulder with mild discomfort.  *Id.*  Dr. Steven Vonsee gave Bub work restrictions until April 15, 1999, but no physician-excused work absences.  R. 168.  Bub was not to lift, pull, or push more than five pounds with her right shoulder and could not reach overhead with her right arm.  *Id.*   Dr. Vonsee recommended that Bub apply an ice pack for first few days followed by application of an ice or heat pack.  *Id.*

On April 19, 1999, Bub returned to Nurse Quarti stating that she had right shoulder pain from reaching.  *Id.*  Quarti assessed repetitive trauma disorder in Bub's right shoulder and upper back.  *Id.*  Bub had normal range of motion, and no signs of impingement.  *Id.*  Bub's previous work restrictions were extended until May 3, 1999.  Quarti recommended two weeks of physical therapy.  *Id.*  According to Bub's physical therapy referral form dated April 19, 1999 from the

Florida Hospital Rehabilitation and Sports Medicine Department, Bub was diagnosed with upper back strain and was referred for physical therapy three times a week for two weeks and to a therapist for evaluation and treatment.  R. 166.

Dr. Sharon Krumins from Bub's work health clinic examined Bub on May 6, 1999.  R. 165.  Bub, again, complained of right shoulder and upper back pain.  *Id.*  The examination showed tenderness over the periscapular and upper trapezius muscles, but otherwise normal results.  *Id.* Bub's previous work restrictions were extended through May 13, 1999.  *Id.*  Dr. Krumins also prescribed a nonsteroidal anti-inflammatory drug.  *Id.*  On July 27, 1999, Bub returned for refills of Dr. Krumins' prescription.  *Id.*

On August 17, 1999, Bub sought treatment with Dr. Scott Gordonfor pain in her right hand.  R. 127.  Bub told Dr. Gordon that she hurt her right elbow in June 1998 and had "complete numbness" in her little finger since that time.  Bub also stated that recently, she experienced increased sensation in her little finger with increasing pain.  *Id.*  Dr. Gordon's physical examination revealed abduction to the little finger and pain throughout the little finger and ulnar aspect of her hand.  *Id.*  Bub's proximal wrist crease also showed signs of Tinel's.  *Id.*  X-rays revealed some possible early minor degenerative changes that were not related to her present symptoms with no obvious bony abnormalities.  *Id.*  Dr. Gordon stated that Bub likely had an ulnar nerve injury, with the ulnar nerve "returning in its function."  *Id.*  Dr. Gordon predicted that Bub's ulnar nerve would be completely functional in six to eight months.  He recommended a follow-up appointment, but stated that "[t]here is really no definitive treatment that needs to be performed." *Id.*

Two days later, on August 19, 1999, Dr. Harald Henningsen, examined Bub for her right ankle pain.  R. 126.  Bub reported injuring her right ankle when she twisted it while walking in a grocery store on July 11, 1998.  *Id.*  She described swelling immediately after the injury, and noted that she had seen doctors for her ankle.   Dr. Henningsen's physical examination revealed tenderness posterolaterally, anterolaterally, and anteromedially.  *Id.*  Bub did not have much soft tissue swelling around her ankle, and range of motion of her toes did not increase the pain.  *Id.*  Dr. Henningsen reviewed an MRI scan (dated July 16, 1999) which was normal.  *Id.*  Dr. Henningsen noted that he needed more information in order to make a diagnosis and recommendation.  *Id.*  He ordered her prior medical records, and suggested a follow-up appointment to review them.  *Id.*

Bub returned to Dr. Gordon on October 19, 1999.  R. 125.  According to Dr. Gordon, Bub's ulnar nerve was recovering.  *Id.*  He noted that Bub still complained of pain associated with the recovery, which he stated was unusual but "consistent."  *Id.*  He recommended that she continue taking Relafen and Ultram, and added a prescription for Darvocet (a narcotic pain reliever).  On January 4, 2000, Dr. Gordon saw Bub and observed that her right hand ulnar nerve was regenerating.  R. 124.  Dr. Gordon noted that Bub still had some pain in her finger, but when the nerve "completely returns, in another 2 to 3 months, [Bub] should have no significant discomfort at all."  *Id.*

Bub sought treatment from Dr. Paul Dowdy on January 17, 2000.  Bub complained of constant pain in her right ankle over the anterior portion and medially and laterally.  R. 275. Bub's ankle exhibited diffuse swelling.  *Id.*   X-rays revealed some minor degenerative changes with a bone spur anteriorly on the distal tibia, but Bub's posterior malleolus fracture appeared to be

-21-

healed.  *Id.*   MRI scans showed some osteochondral lesions on the distal tibia but "no definitive

loose body or osteochondral lesions."  *Id.*   Dr. Dowdy's impression was ankle pain status post

sprain with fracture.  *Id.*   He injected the right ankle with Xylocainae and Celestone, and

prescribed an ankle brace.  *Id.*

Bub returned to Dr. Dowdy on January 31, 2000 for a follow-up appointment.  R. 274.

Bub told Dr. Dowdy that the injection from her prior visit "helped completely the majority of her

pain, but the lateral pain not at all (sic)."  *Id.*   Bub also reported that her medial pain returned.  Dr.

Dowdy's examination revealed tenderness over her peroneal tendons laterally and moderate medial

joint line tenderness about the ankle.  *Id.*   Bub was neurovascualarly intact distally.  *Id.*   Dr.

Dowdy diagnosed osteochondral injury of the right ankle.  *Id.*   Dr. Dowdy suggested arthroscopic

surgery, but noted that surgery would probably not improve Bub's lateral ankle pain.  *Id.*   On

February 24, 2000, Bub underwent right ankle arthroscopic surgery.  R. 269-70.

On March 6, 2000, Bub saw Dr. Dowdy who stated that Bub was doing well after her

arthroscopic surgery.  R. 267.  He noted that Bub only had moderate swelling, and found that her

wounds were healing without any evidence of infection.  *Id.*   Dr. Dowdy recommended range of

motion exercises for her ankle and subtalar joint, and suggested that she remain "off work" until

her follow-up appointment in two weeks.  *Id.*   On March 20, 2000, Bub returned and continued to

complain of lateral pain in her ankle.  R. 266.  Dr. Dowdy's impression was peroneal tendinitis

right foot status post right ankle arthroscopy and arthroscopic surgery.  *Id.*   He prescribed anti-

inflammatory medication and physical therapy to improve range of motion and strength in her

ankle.  R. 265-66.

Bub went to Dr. Dowdy again on April 5, 2000.  R. 263.  Bub had minimal swelling but told Dr. Dowdy that she had persistent pain along the posterolateral aspect of her ankle over her peroneal tendon sheath.  *Id.*  She also reported moderate medial pain.  *Id.*  Dr. Dowdy diagnosed peroneal tendinitis of her right foot status post right ankle arthroscopy.  *Id.*  He recommended that Bub continue to take Celebrex and start physical therapy.  *Id.*

Bub returned on May 8, 2000 complaining of severe lateral and ankle and foot pain.  R. 261.  Dr. Dowdy noted that examination revealed "excellent motion and minimal tenderness."  *Id.* Bub had marked tenderness along the posterolateral aspect of her ankle over her peroneal tendon sheath.  *Id.*  Dr. Dowdy recommended that Bub continue physical therapy and continue taking Celebrex.  *Id.*  On June 5, 2000, Bub saw Dr. Dowdy and reported that her ankle pain was "much better," but also complained of persistent posterolateral ankle and leg pain.  R. 257.  Dr. Dowdy noted that Bub had excellent motion of her ankle and similar tenderness as found in her previous visit.  *Id.*  He advised Bub to continue doing the home exercises Bub learned in physical therapy. *Id.*

X-rays of Bub's left foot dated June 27, 2000 show some degenerative changes, but no evidence of fracture or dislocation.  R. 121.  Bub visited Dr. Dowdy on July 31, 2000 with complaints of posterior and lateral ankle pain.  R. 120.  Dr. Dowdy noted excellent motion of her ankle with marked tenderness posterolaterally over her peroneal tendons.  *Id.*  Bub had mild paronychia on her big toe, but Dr. Dowdy noted that it had been treated appropriately.  *Id.* Examination of her left foot revealed no evidence of infection.  *Id.*  Dr. Dowdy diagnosed: 1.) persistent peroneal tendinitis status post right ankle arthroscopy, 2.) right great toe paronychia, and

3.) left foot infection which Dr. Dowdy stated was "resolved."  *Id.*  He recommended that Bub continue doing exercises for her right ankle and foot, and left her in the care of her primary care physicians.  He stated "I feel her right great toe and her right foot infection have been treated completely appropriately and seem to be resolving."  *Id.*

On August 21, 2000, Bub went to Dr. Francisco Noda for a second opinion (upon referral from Dr. Gordon) about her right ankle pain.  R. 123.  Bub reported persistent ankle problems, but admitted that the symptoms started to improve after her ankle arthroscopy in February 2000.  *Id.* She stated that her pain was local to the peroneal tendon distribution from the distal third of her leg posterolaterally under the fibula and into her foot.  *Id.*  Dr. Noda looked at her ankle and noted that the arthroscopy portals healed well, with some tenderness over the distal 4-5cm of the peroneal.  *Id.*  Bub had twenty degrees of dorsiflexion, thirty degrees of planta flexion, and ten to fifteen degrees of inversion and eversion at the subtalar joint.  *Id.*   The inversion was painful on the perioneal distribution.  *Id.*  Dr. Noda reviewed a report on Bub's July 1999 MRI scan, which showed an osteochondral defect in the ankle with intact peroneal's, posterior tibial and ligament structures.  *Id.*  Dr. Noda assessed problems stemming from the ankle injury and residual peroneal tendinitis.  *Id.*  He recommended exercises with intermittent use of a fracture boot and air cast brace.  *Id.*

On October 16, 2000, Bub returned to Dr. Dowdy with continued complaints of posterolateral ankle joint pain.  R. 116.  Dr. Dowdy observed subluxing peroneal tendons, and diagnosed peroneal tendinitis and subluxation status post right ankle arthroscopy.  *Id.*  Dr. Dowdy administered an injection of Celestone and Marcaine.  *Id.*  On November 1, 2000, Bub returned

-24-

with similar complaints, stating that the injection did not help her pain at all.  R. 117.  X-rays showed no new changes.  *Id.*  Dr. Dowdy diagnosed continuing right ankle pain status post arthroscopic surgery.  *Id.*  He recommended symptomatic treatment.  *Id.*

On January 5, 2001, Dr. Christopher Mason saw Bub for her right ankle pain.  R. 178.  Dr. Mason observed a significant amount of swelling in Bub's right ankle and crepitus with range of motion, which Dr. Mason stated was consistent with a probable lesion.  *Id.*  Dr. Mason recommended another MRI scan, and noted that Bub might need more surgery.  *Id.*

Bub went to the hospital on January 15, 2001 with complaints of dizziness and light-headedness.  R. 135.  Bub was diagnosed with uncontrolled hypertension, dizziness, fatigue, heartburn, and an ingrown toenail on her right first toe.  *Id.*

On January 26, 200, Bub saw Dr. Mason again with complaints of ankle pain and an ingrown toenail.  *Id.*  According to Dr. Mason, Bub's MRI results showed some type of osteochrondral lesion.  *Id.*  Dr. Mason's physical examination revealed significant crepitus with painful joint effusion, and a paronychia (a nail infection) around her right great toe.  *Id.*  Dr. Mason recommended surgery.  *Id.*

On February 5, 2001, Bub sought treatment from Dr. Gordon for pain at the base of her right thumb "associated with clicking and popping."  R. 135.  Dr. Gordon noted specific tenderness at the A1 pulley with obvious triggering.  *Id.*  He assessed right trigger thumb, and gave Bub a cortisone injection.  *Id.*  He recommended that Bub apply ice to her thumb and take a mild narcotic pain medication.  *Id.*

Bub returned to Dr. Mason on February 7, 2001 to follow-up with her infection and for continued complaints of pain in her ankle.  R. 177.  Dr. Mason noted that her ankle was healing nicely from the surgery, although it remained swollen and symptomatic.  *Id.*  Bub decided to undergo a second surgery, and saw Dr. Mason for a preoperative consultation on February 26, 2001.  *Id.*  Dr. Mason noted that Bub had a talar lesion and possible anterior impingement syndrome.  *Id.*  Bub was admitted to the Orlando Regional Healthcare System hospital on March 2, 2001 for surgery, and discharged the same day.  R. 179.  Dr. Mason performed a diagnostic arthroscopy with debridement on Bub's right ankle.  R. 183- 84.  On March 9, 2001, Dr. Mason observed some post-operative swelling but no evidence of infection or other complications.  R. 176.

Bub visited Dr. Mason on April 6, 2001.  *Id.*  She reported improvement and compliance with home physical therapy exercises.  *Id.*  She also told Dr. Mason that she would rather do home therapy than formal therapy.  *Id.*  Dr. Mason found no evidence of complications, and recommended home physical therapy.  *Id.*  He instructed Bub to follow-up with him in two months, and use her right foot and ankle for weightbearing "as tolerated."  *Id.*

On April 19, 2001, Bub went to the hospital complaining of daily migraines and hot flashes.  R. 136.  Bub also complained of having thick and yellow toenails on her right foot.  *Id.*  Bub was diagnosed with migraines, vasomotor changes, and onychomycosis (nail fungal infection) on her right first, second, and third toenails.  *Id.*  The doctor recommended Toprol and an estrogen patch.  *Id.*

Bub returned to Dr. Mason on June 1, 2001, and reported having some ankle swelling and pain. *Id.* Dr. Mason found that Bub was vascularly intact but had a moderate degree of ankle joint effusion. *Id.*

On July 23, 2001, Bub sought treatment with Dr. Jonathan Blum with complaints of discomfort in her left foot and toes and various problems related to her peroneal tendinitis. R. 113. Bub reported that she felt much better and was able to ambulate better after her February 2001 arthroscopic surgery. *Id.* Dr. Blum diagnosed: 1.) peroneal tendinitis in her right ankle with minimal dislocation, 2.) status post right ankle arthroscopy with osteochondral lesion, 3.) onychomycosis, and 4.) Tinea pedis (Athlete's foot) on her left ankle. R. 114. Muscle testing in all groups were 5/5. R. 113. Bub had pain on palpation to the peroneal tendons, and some very minimal displacement of the peroneal tendons on forced dorsiflexion and inversion. *Id.* Dr. Blum recommended that Bub use her TENS unit (a transcutaneous electro-nerve stimulator that aids in controlling pain by stimulating nerve endings)for the peroneal tendinitis and take Motrin. R. 114. Dr. Blum noted that if Bub continued to improve on her right side, "no further intervention would probably be needed for that . . ." *Id.* He recommended oral Lamisil for her left foot. *Id.*

On August 13, 2001, Bub returned to Dr. Mason and related that she was still having some problems with her right ankle. R. 175. Dr. Mason's examination revealed that Bub was vascularly intact, but still had some residual effusion in the ankle, which suggested presence of crepitus. *Id.* Dr. Mason suggested another MRI scan. *Id.* The doctor reviewed the MRI results during Bub's next visit on August 15, 2001. *Id.* According to Dr. Mason, the MRI showed a "clean scan," and that Bub had some soft tissue swelling and ligamentous distraction, but was otherwise doing well.

*Id.*  Dr. Mason recommended that Bub continue with her present therapy and continue taking her

non-steroidal anti-inflammatory medication.  *Id.*  Bub returned to Dr. Mason on September, 17,

2001.  R. 174.  Bub told Dr. Mason that she tried to put on compression hosiery on both legs, but

could only put it on her left.  *Id.*  She stated that the compression hosiery felt "very good."  *Id.*  The

doctor observed a significant amount of swelling and joint effusion.  *Id.*  He recommended a

Medrol Dosepak.  *Id.*

Dr. Blum saw Bub again on October 2, 2001 to check on her progress in taking Lamisil.  R.

112.  She reported no problems or complications, but reported pain on the outside and inside of her

right ankle.  *Id.*  Dr. Blum  assessed onychomycosis of the first, second, and third right foot toes,

but his physical examination showed that she had new nail growth in those toes.  *Id.*  He

recommended that she continue taking Lamisil and clean her shoes and showers.  *Id.*

On October 5, 2001, Bub told Dr. Mason that she still had lateral foot pain.  R. 174.  Dr.

Mason found that Bub was vascularly intact and her swelling was "down."  *Id.*  She had some joint

effusion and a mild secondary peroneal tendinitis, which was compensatory in nature.  *Id.*  He

recommended that she continue to take anti-inflammatory medication and Celebrex daily.  *Id.*  In

his treatment notes on his assessment and plan for Bub, Dr. Mason also wrote "Activities ad lib.

[sic]."  *Id.*

On the same day, Bub filed a claim for disability insurance benefits, claiming disability as

of August 19, 1999 due to problems with her right ankle stemming from a fracture of her ankle in

1998 and subsequent surgeries.  R. 47-49, 78-79.  In her work history report, Bub described her

former work as a medical receptionist.  R. 67.  Her duties included answering phones, making

-28-

appointments, filling out insurance forms, filling the doctor's supplies, and ordering new supplies. *Id.* She used a typewriter and filed patient's charts. *Id.* In a normal workday, she was required to: walk for one hour; stand for one hour; sit for six hours; and write, type, or handle small objects for six hours. *Id.* She was not required to climb, stoop, kneel, crouch, crawl, or handle large objects. *Id.* The heaviest Bub lifted was less than ten pounds, and she lifted less than ten pounds frequently. *Id.* She lifted and carried "only" paper and folders from her desk to the file cabinet, and from her desk to the doctor. *Id.*

On November 20, 2001, Bub told Dr. Blum that she was doing well and using Lamisil for her right foot infection. R. 111. She complained, however, that the fourth interspace on her left foot had been itching, scaling, and uncomfortable since she ran out of the Spectazole cream she had been using. *Id.* She also reported that her right hallux nail had become incurvated, and that she tried to dig it out several times. *Id.* Dr. Blum noted that Bub had an incurvated medial border of the right hallux nail with no erythema, edema, drainage or clinical signs of infection. *Id.* Bub also had some callous at the distal tip from excessive ingrowing. *Id.* Dr. Blum assessed onychomycosis in her right toes, Tinea pedis in the fourth interspace of her left foot, and an ingrown medial border in her right hallux nail. *Id.* He removed the ingrown nail border on the right side, and recommended Spectazole cream for the fourth interspace on her left side. *Id.*

Bub returned to Dr. Blum on December 3, 2001 to follow up after removal of her ingrown nail. R. 110. Bub having a similar problem in the left medial aspect of the toe. *Id.* Dr. Blum assessed an ingrown nail with a nail infection in her left hallux medial border and Tinea pedis. *Id.* He noted that the ingrown nail on her right side was resolved after last visit's procedure to remove

-29-

the nail.  *Id.*  Dr. Blum performed a similar procedure to remove her ingrown nail on the left side,

and changed her prescription from Spectazole cream to Loprox cream.  *Id.*  He also prescribed

Keflex.  *Id.*  Bub went to Dr. Blum for a follow-up examination on December 17, 2001.  R. 109.

Bub reported feeling better after using the Loprox cream.  *Id.*  Dr. Blum assessed Tinea pedis and

post-procedure status for her medial border, left hallux nail.  *Id.*  He noted some fibrotic ingrowth,

but dramatic decrease in edema and scaling in her third and fourth interspaces.  *Id.*  The doctor

recommended that Bub continue using Loprox cream.  *Id.*

On January 2, 2002, Bub sought treatment with Dr. Mason for continued ankle pain.  R.

213.  Dr. Mason's examination revealed that Bub still had some residual effusion in her ankle.  *Id.*

Dr. Mason treated Bub with an injection.  *Id.*

Dr. Arlene Palazzolo evaluated Bub on January 11, 2002.  R. 197.  Bub complained of

constant pain in her right foot.  *Id.*  She described that pain as an aching pain in the morning that

progressed to a sharp pain by the end of the day.  *Id.*  Bub also reported taking Celebrex and

Ultracet with "adequate pain relief."  *Id.*  Bub also complained of headaches, arthalgia in her knees

and small joints of her hands, occasional heartburn, and epigastric discomfort.  R. 198.  Dr.

Palazzolo opined that Bub could perform any clerical and secretarial duties, including  tasks

involving limited walking or walking alternating with sitting and standing.  *Id.*  Dr. Palazzolo also

noted that Bub should avoid ladders.  *Id.*  The doctor's physical examination revealed mainly

normal results.  R. 198-99.  The doctor observed swelling and pain on palpation of Bub's right

ankle, but saw no restriction in the range of motion.  R. 198.  Bub walked without assistance, and

was able to walk toe to heel.  *Id.*  Walking on her heels was difficult, and Bub stopped walking

after two steps because of pain in her ankle.  *Id.*  Dr. Palazzo also noted that Bub had no

restrictions based on low back pain.  R. 199.  Bub exhibited normal range of motion of the L-S

spine, and normal straight leg raising.  *Id.*

Bub visited Dr. Gordon on January 15, 2002 with complaints of pain in her right shoulder.

R. 108.  But told Dr. Gordon that she could not recall any specific trauma to her shoulder during

the two months prior, and that the pain was localized to her shoulder with no radiation past the

elbow.  *Id.*  Dr. Gordon noted that Bub had "pretty good" range of motion of her shoulders, and no

significant pain on active abduction against resistant.  *Id.*  The doctor assessed right shoulder

bursitis, and gave Bub a cortisone injection to relieve her discomfort.  *Id.*  He also recommended

that Bub apply ice, take a mild narcotic pain medication, and continue taking Celebrex.  *Id.*

On January 30, 2002, Bub visited Dr. Mason for pain on the outside of her ankle.  R. 212.

Dr. Mason noted that Bub possibly had a slight nerve impingement around the sural nerve and the

anterior distal fibula.  *Id.*  Dr. Mason gave Bub an injection of Celestone.  *Id.*

Bub returned to Dr. Gordon on February 5, 2002.  R. 107.  She reported that the cortisone

injection in her right shoulder gave her some relief, but complained of residual pain along the

lateral inferior border of the scapula.  *Id.*  Dr. Gordon suggested that Bub continue to take

Celebrex and a mild narcotic pain medication and participate in physical therapy on a formal basis.

*Id.*

On February 6, 2002, a state agency physician completed a physical RFC assessment for

Bub.  R. 202-09.  Bub's primary diagnosis was right ankle pain after a fracture with a secondary

diagnosis of a history of low back pain.  R. 202.  The physician opined that Bub could: lift and

carry twenty pounds occasionally and ten pounds frequently; stand, walk, or sit approximately six hours during an eight-hour workday; and push or pull without limitation.  R. 203.  Bub could never climb ladders, ropes, and scaffolds, but had no other postural, manipulative, visual, communicative, or environmental limitations.  R. 204-06.

On February 13, 2002, Bub saw Dr. Mason.  R. 212.  Bub reported continued pain.  *Id.*  Dr. Mason noted that she was vascularly intact with some joint effusion.  *Id.*  He told Bub that he was unsure about the cause of her pain, and asked Bub to consider re-arthroscopy.  *Id.*

On April 11, 2002, Bub went to the hospital with complaints of right shoulder pain.  R. 144.  The assessment was right shoulder pain, myopathy, and general lower back pain.  *Id.*  An MRI of Bub's lumbar spine dated April 15, 2002 revealed spondylitic bulges at L4-L5 and L5-S1 with mild canal stenosis at L5-S1.  R. 210.  The MRI also showed a spondylitic bulgeat L2-L3 with mild left posterolateral asymmetry.  *Id.*

On April 17, 2002, Bub informed Dr. Mason that she was still experiencing pain and swelling in her right ankle.  R. 212.  Bub agreed to another arthroscopy.  *Id.*  On May 3, 2002, Bub saw Dr. Mason after her arthroscopy.  R. 211.  Dr. Mason's examination showed no evidence of complications.  *Id.*  Bub complained of complaints of pain in her hands.  Dr. Mason recommended taking X-rays of Bub's hands, wrist, and arms, and a follow-up appointment to remove the sutures from Bub's arthroscopy.  *Id.*  On May 6, 2002, x-rays of Bub's right shoulder and right humerus revealed calcification adjacent the greater tuberosity.  R. 190.  X-rays of Bub's right hand revealed mild degenerative changes.  R. 191.  The x-rays, otherwise, showed no significant findings.  R. 190-91.

Bub returned to Dr. Gordon on May 13, 2002, and told him that she still having pain in her right shoulder.  R. 106.  Dr. Gordon noted that Bub had problems moving her right shoulder, and suggested that Bub consider right shoulder arthroscopy.  *Id.*  Bub agreed to undergo the procedure.  *Id.*  Bub also complained of right thumb pain.  *Id.*  Dr. Gordon treated Bub with injections to her thumb, which he predicted would provide her relief for at least three or four months.  *Id.*  Dr. Gordon diagnosed right shoulder impingement syndrom with bursitis.  R. 237. He performed the right shoulder arthroscopy on May 24, 2002.  R. 237-38.

Bub saw Dr. Gordon on May 28, 2002.  R. 105.  Dr. Gordon noted that the arthroscopy went "very smoothly," and that Bub's wounds looked "excellent."  *Id.*  He recommended that Bub begin working on range of motion in her shoulder, and wean herself off her pain medications.  *Id.* He also suggested home physical therapy.  *Id.*  On June 11, 2002, Dr. Gordon noted that approximately forty to fifty percent of Bub's normal range of motion in her right shoulder had returned.  R. 104.  He instructed Bub to work more on her therapy with a pulley and to take anti-inflammatory and pain medication if needed.  *Id.*

On June 21, 2002, Bub told Dr. Mason that she was still had swelling and pain in her right lower extremity.  R. 285.  Dr. Mason observed that Bub's range of motion was excellent, with no evidence of crepitus.  *Id.*  He noted that joint effusion was present.  *Id.*  Dr. Mason recommended "[i]mmobilization" and anti-inflammatory medication.  *Id.*

On July 15, 2002, another state agency physician completed a physical RFC assessment. R. 241-48.  The primary and secondary diagnoses were ankle degenerative joint disease and shoulder bursitis, respectively.  R. 241.  The physician opined that Bub could: lift and carry twenty

pounds occasionally and ten pounds frequently; stand, walk, or sit approximately six hours in an

eight-hour workday; and push or pull without limitation.  R. 242.  Bub was occasionally limited in

climbing rope and scaffolds due to her ankle pain, but had no other postural limitations.  R. 243.

The physician also opined that Bub had frequent limitation in reaching in all directions with her

right shoulder.  R. 244.  Bub had no other manipulative, visual, communicative, or environmental

limitations.  R. 244-46.

On July 24 2002, Dr. Mason noted that Bub still had some residual joint effusion, but

reported that Bub was improving.  R. 285.  On August 6, 2002, Bub was seen by Dr. Gordon.  She

was status post right shoulder subacromial decompression.  She had full range of motion and only

minimal pain every once in a while.  R. 295.  On August 22, 2002, she returned with some pain in

the region.  She underwent an injection.  R. 293.

On September 6, 2002, Bub went to Dr. Mason and complained of continued pain.  R. 285.

The doctor noted that Bub was vascularly intact, and that Bub had joint effusion noted with pain.

*Id.*  He recommended another MRI of the ankle.  *Id.*   An MRI of Bub's right ankle taken on

September 13, 2002 revealed abnormal subchondral signal changes of the anterior tibial plafond,

which the doctor noted were most consistent with either degenerative changes or remote

osteonecrosis.  R. 283.  The marrow in this area was otherwise unremarkable, showing no

evidence of acute fractures or contusions.  *Id.*  The doctor also observed small joint effusion and

some artifactual signal intensity (consistent Bub's history of surgery).  *Id.*

On September 17, 2002, Bub visited Dr. Gordon, and reported that most of the pain in her

right shoulder was resolved, except for some muscle ache and a "little bit of pain" at the deltoid

insertion at the greater tuberosity on the humerus.  R. 291.  Dr. Gordon noted that her symptoms were not unusual considering her surgery, and stated that her ache would hopefully resolve with exercise.  *Id.*  Bub also complained of pain in the lateral elbow region with radiation to the wrist. Dr. Gordon assessed right early lateral epicondylitis, and recommended that Bub use her proximal forearm brace and continue taking anti-inflammatory medication.  *Id.*

On October 4, 2002, Dr. Mason reviewed the September 6, 2002 MRI, and noted that the results were consistent with degenerative changes.  R. 284.  Dr. Gordon suggested that Bub continue taking her anti-inflammatory medications.  *Id.*

Dr. Gordon saw Bub on October 15, 2002.  R. 290.  Bub reported having some pain around her clavicle, but Dr. Gordon thought that this pain would resolve.  *Id.*  Bub also complained of some right lateral epicondylitis.  *Id.*  Dr. Gordon stated that Bub did not "require" a cortisone injection, and that Bub was doing well using her forearm brace and anti-inflammatory medications.  *Id.*

On October 23 and November 6, 2002, Dr. Mason treated Bub with cortisone injections in her right ankle.  R. 284.  On December 2, 2002, Bub returned to Dr. Mason.  R. 282.  Dr. Mason noted degenerative changes according to Bub's MRI, and suggested ankle fusion.  *Id.*  On January 10, 2003, Bub, again, complained of pain in her right lower extremity.  *Id.*  Dr. Mason found that Bub was vascularly intact, and recommended a doppler study of Bub's lower extremity.  *Id.*  A bilateral lower extremity venous doppler study dated January 20, 2003 revealed no evidence of acute (neither deep nor superficial) vein thrombosis.  R. 281.  On January 31, 2003, Dr. Mason

examined Bub and found that Bub had "severe ankle osteoarthritic changes traumatically induced." R. 282.  He recommended non-steroidal anti-inflammatory medication.  *Id.*

On February 4, 2003, Dr. Gordon saw Bub who complained of pain in the left wrist on the dorsal aspect radiating distally.  R. 287.  Bub told Dr. Gordon that she had great range of motion in her shoulder and only mild discomfort occasionally.  *Id.*  Bub also stated that she was doing very well overall.  *Id.*  Dr. Gordon assessed left dorsal radial wrist pain, possibly secondary to occult ganglion cyst, tendinitis or arthritis of the wrist.  *Id.*  His physical examination revealed pain in her wrist on palpation but no significant swelling.  *Id.*  Bub still had range of motion in her wrest with some pain.  *Id.*  Dr. Gordon gave Bub a cortisone injection in her wrist.  *Id.*  He recommended that she ice her wrist, take a mild narcotic pain medication, and wear a splint.  *Id.*  She returned to Dr. Gordon on February 25, 2003 with continued complaints of left wrist pain.  R. 286.  Dr. Gordon noted that she had "pretty good" range of motion in her wrist, and that a lot of her swelling had diminished.  *Id.*  In his treatment notes, Dr. Gordon states that "[t]here is really not much we can do at this point."  *Id.*  X-rays taken during the visit did not reveal any bony abnormalities.  *Id.*  He recommended that Bub continue icing the area, taking medication, and using the splint.  *Id.*

On March 10, 2003, Bub went to hospital with complains of right ankle pain and swelling in her left hand.  R. 302.  The doctor assessed wrist pain and degenerative joint disease in her right ankle.  *Id.*  The doctor referred Bub to Dr. Dowdy for her ankle, recommended an MRI scan of Bub's wrist and hand, and told Bub to continue taking her medications.  *Id.*  The MRI of Bub's left wrist and hand revealed normal results, showing only an old chip fracture on her wrist.  *Id.*

-36-

On April 14, 2003, Dr. Francisco Halili examined Bub who reported developing pain in her mid-abdomen with stretching. R. 297-98. Dr. Halili assessed an umbilical hernia. R. 198. The doctor also stated that he could not rule out the possibility that Bub had an incisional hernia. *Id.* Dr. Halili also noted that Bub had normal range of motion and grossly normal strength in her extremities. *Id.* He recommended surgery. *Id.*

On June 18, 2003, Bub went to Dr. Mason with complaints of a nail infection. R. 317. Dr. Mason found that her nail was dystrophic and onychomycotic, but could not find any evidence of secondary bacterial infection. He removed the nail "without any difficulty," and found no infection on the nail bed. *Id.*

On July 7, 2003, Bub visited Dr. Dowdy. R. 313. His impression was that Bub's right great toe paronychia was resolved, and that she had continuing right ankle pain secondary to osteochondral talar dome defect. *Id.* He found no evidence of infection in her toe, and observed that she had "fairly supple motion" of her ankle. *Id.*

On July 9, 2003, Dr. Jerry A. Rubin evaluated Bub for her wrist pain. R. 312. The pain radiated into the thumb and into the ulnar wrist. Dr. Rubin's physical examination revealed some slight synovia type swelling overlying Lister's tubercle and some tenderness along her tenders. *Id.* Bub also had some mild pain with forced flexion and extension of the wrist. *Id.* Radiographs taken showed some cystic change with some mild sclerosis, normal carpal alignment, and no signs of fracture and other problems. *Id.* Dr. Rubin diagnosed left dorsal wrist pain and swelling with possible extensor pollicis longus tenosynovitis. *Id.* Dr. Rubin suggested that Bub might benefit from a cortisone injection, but recommended that Bub wait until he reviewed previous doctors'

notes.  *Id.*  She returned on July 30, 2003.  R. 311.  Dr. Rubin observed with some mild synovial-type swelling over Bub's dorsal radial wrist, and diagnosed "probably" scaphotrapezial arthritis in her left wrist or extensor pollicis longus tenosynovitis.  *Id.*  He reviewed her previous doctors' notes, and administered injections.  *Id.*  Bub reported relief of her pain immediately following the injection, which Dr. Rubin noted was a "good prognostic indicator."  *Id.*  According to Dr. Rubin, Bub was able to resume regular activities.  He also prescribed Celebrex.  *Id.*

On September 30, 2003, Bub's disability insurance status expired.  Bub returned on October 1, 2003 to Dr. Mason.  R. 317.  Dr. Mason observed an osteochondral lesion in her ankle.  *Id.*  He noted that Bub still had significant swelling and was not responding to conservative care.  *Id.*  He discussed both surgical and conservative options for treatment.  *Id.*  On November 19, 2003, she returned still complaining of ankle pain.  *Id.*  Dr. Mason noted significant osteo-degenerative changes.  *Id.*  He suggested that Bub consider additional scoping and fusion.  *Id.*

In a letter addressed to Bub's disability benefits representative dated January 6, 2004, Dr. Mason stated that Bub had seen him for several years with complaints of right ankle pain  – pain that was increasing in intensity and frequency.  R. 316, 318-19.  He noted that radiographs and MRI's showed significant early degenerative changes, and summarized Bub's history of surgery.  *Id.*  Dr. Mason opined that Bub would continue to ambulate with severe pain and discomfort and that she would need additional surgical intervention in the future.  *Id.*  Dr. Mason saw Bub on February 11, 2004 who complained of significant ankle pain.  R. 314.  The doctor's examination revealed mild crepitus, significant joint effusion, and substantial pain.  *Id.*  He recommended that Bub obtain another MRI.  *Id.*

-38-

An MRI of Bub's right ankle dated February 16, 2004 revealed: 1.) a large subchondral cyst noted distal tibial anteriorly with severe chondomalacia noted along the articular surface of the distal tibia in the region of the subchondral cyst (with mild reactive edema in the region suggesting active inflammation), 2.) small joint effusion in the tibiotalar and subtalar compartments, and 3.) an accessory ossicle in the distal posterior tibial tendon at the navicular insertion.  R. 315.   On February 27, 2004, Dr. Mason reviewed Bub's MRI (which he stated showed significant destructive changes to the ankle), and recommended that Bub go to the Mayo Clinic for ankle replacement consultation.  R. 314.

On April 14, 2004, Bub testified at the hearing before the ALJ.  R. 320.  Bub testified about her previous job as a receptionist in a dermatologist's office.  R. 331-32.  She testified that the job duties involved mostly office work, including filing, typing, and making appointments.  R. 332.  Bub also stated that she was able to shower, dress, and otherwise take care of her own personal hygiene, except for brushing her hair.  R. 336.  She occasionally helps her husband gather laundry, and loads the drying machine herself.  R. 336-37.  Bub also testified that she was able to fold her own laundry.  R. 337.

Bub also testified about the pain she experiences.  Bub testified that she had severe pain in her right ankle and back that was sometimes so sharp and strong that it was "debilitating."  R. 340.  She also described her back pain as "excruciating" at times, and that the pain often traveled to her legs and hips.  *Id.*  Bub stated that she could only do limited work on a keyboard because of her arm pain, and that she had developed left arm pain during the previous six to eight months.  R. 341.  Bub described having discomfort in her stomach from her umbilical hernia, but stated that it

-39-

was usually bearable.  R. 342.  She testified, however, that any lifting caused sharp pain in her

stomach.  *Id.*  Bub also related that she was hoping to undergo ankle replacement surgery at the

Mayo Clinic, and was awaiting approval from her insurance company.  R. 345.  She reported

taking Soma for her arm and that it made her sleepy, but that she did not have any other adverse

side effects from her medication.  R. 346.  She reported sitting for no more than twenty or thirty

minutes at a time while at home, and not being able to stand for more than ten minutes at a time.

R. 347.  On May 24, 2004, the ALJ issued a decision that Bub was not disabled and not entitled to

benefits.  R. 23.

### B.    THE ANALYSIS

Following a detailed and thorough review of the medical and other record evidence, the

ALJ found that Bub retained the RFC to perform some of physical exertional requirements of light

work, including the ability to lift and carry twenty pounds occasionally and ten pounds frequently.

R. 21, 22, Finding 7.  The ALJ found that Bub could perform her past relevant work as a medical

receptionist as the job did not require the performance of work-related activities precluded by her

RFC.  R. 23, Finding 8.  Because Bub could perform her past relevant work, she was not disabled.

*Id.*, Findings 9, 10.  Bub claims that the ALJ erred in two ways: 1.) by failing to fully develop the

record on both the physical and mental demands of Bub's past relevant work, and 2.) by

improperly discounting Bub's testimony about her pain.  Docket No. 17 at 12, 14.

### 1.    The ALJ's Consideration of Bub's Past Relevant Work

Bub contends that the ALJ erred in finding that Bub could perform her past work as a

medical receptionist.  *Id.* at 12.  Bub argues that because the ALJ only mentioned Bub's abilities to

-40-

lift and carry in his specific findings, the ALJ failed to fully develop the record on and properly consider all of the requirements of Bub's past work.  *Id.*   The Commissioner counters that, while the ALJ did not specifically discuss all demands of Bub's past relevant work, substantial evidence nevertheless supports his finding that Bub could perform her past job as a medical receptionist. Docket No. 18-1 at 6.  The Commissioner is correct.

First, Bub is incorrect that the ALJ only considered Bub's abilities to lift and carry. Following a detailed review of the evidence in the record, the ALJ adequately analyzed Bub's RFC as to all of her relevant abilities.  The ALJ afforded "great weight" to the two state agency physicians' assessments of Bub's RFC — assessments which included opinions on Bub's abilities to lift, carry, stand, walk, and sit, as well all other relevant limitations.  R. 21.  The ALJ found that Bub retained the RFC to perform the exertional demands of light work as defined by 20 C.F.R. § 404.1567[4] — a definition that includes factors other than just the ability to lift and carry.  *Id.*

Also, the ALJ properly found that Bub's RFC did not inhibit her from performing the duties of her past relevant work as a medical receptionist.  Bub incorrectly argues that the ALJ "only considered the strength requirements of the job . . . without considering the sitting and standing requirements of her past work . . ."  Docket No. 17 at 12.  The ALJ specifically noted that Bub's former job as a medical receptionist required her to lift up to ten pounds and sit for

---

[4]Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  20 C.F.R. § 404.1567(b).  Section 404.1567(b) also provides that:

> [e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

*Id.*

prolonged periods.  R. 22.  The ALJ then determined that Bub could return to her former job as it is "generally performed in the national economy" as defined in the Dictionary of Occupational Titles ("DOT").[5]  R. 22.

Neither Bub's description of her job (in her work history report and her testimony at the hearing) nor the DOT description suggests that Bub is unable to return to her former work.  Bub's former work, as defined in the DOT, is sedentary work.  It requires walking or standing for "brief periods of time," and almost no postural physical demands, other than reaching, handling, fingering, talking, and hearing.  DOT 237.367-038.  Furthermore, substantial evidence supports the ALJ's findings.  The ALJ correctly notes (*inter alia*):  that none of Bub's treating physicians placed any restrictions on her work (other than temporary restrictions stated by doctors and nurses from Bub's work health clinic well before the alleged onset of Bub's disability);  that several doctors (including Dr. Halili, Dr. Mason, and Dr. Gordon) observed that Bub had normal range of motion in her extremities and her wrist; and that, by her own admission, Bub is able to walk and perform many activities independently.  R. 19-21.  The ALJ did not err, as Bub contends, by "failing to fully . . . develop the record regarding the physical and mental demands of her past relevant work."  Docket No. 17 at 13.

---

[5]According to Social Security Ruling 82-61, the ALJ may apply one of two tests to determine if a claimant can perform the past relevant work.  A claimant will be found to be "not disabled" if the claimant retains the RFC to perform: 1.) the actual functional demands and job duties of the past relevant work; **or** 2.) the functional demands and job duties of the job as generally required by employers in the national economy.  SSR 82-61 (emphasis added).  The ALJ may rely on the Dictionary of Occupational Titles (DOT) descriptions to define that job as it is usually performed in the national economy.  *Id*.  Further, even if the actual functional demands of the former work exceed those as described in the DOT, if the claimant can perform the functional demands and job duties as generally required by the employers throughout the national economy, the claimant should be found to be "not disabled."  *Id*.

2.     The ALJ's Decision to Discredit Bub's Pain Testimony

Bub contends that the ALJ erred in using only Bub's activities of daily living and the fact that Bub walks without using an assistive device to discredit Bub's testimony about her disabling pain.  Docket No. 17 at 13.  Bub also argues that the ALJ failed to articulate specific and adequate reasons for discrediting Bub's testimony.  *Id.* at 14.  The Commissioner responds that the ALJ properly considered and rejected Bub's subjective complaints of pain under the relevant standards. Docket No. 18-1 at 7-10.  Bub's arguments lack merit.

The ALJ did consider Bub's subjective complaints of pain in light of the relevant evidence in the record, and did not solely consider Bub's activities and ability to walk without an assistive device.  The ALJ found that Bub's statements were not credible "in light of the claimant's own description of her activities and lifestyle, the degree of medical treatment required, the reports of the treating and examining practitioners, and the findings made on examination."  R. 20.  The ALJ articulated detailed reasons for discrediting Bub's subjective complaints, and pointed to specific medical and other evidence as support for his findings.  R. 21.  The record simply does not support Bub's claims that her pain is disabling.  Substantial evidence supports the ALJ's decision to discredit Bub's testimony, and remand is unnecessary.

## VI.     CONCLUSION

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

-43-

should enter a judgment and close the case.

      **DONE AND ORDERED** this 29th day of March, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia     30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL     33602

The Honorable Henry U. Snavely
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL     32817

-44-